THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ATLANTIC CIRCULATION, INC., et al.,  :
                                  :

        **Plaintiffs**       :

    v.                            :     **1:10-CV-1368**
                                    :     **(JUDGE MARIANI)**

MIDWEST CIRCULATIONS, LLC, et al.,  :

                                  :

        **Defendants**      :

## MEMORANDUM OPINION

Trial was held in the above-captioned case on July 2, 2012 and concluded on July 6, 2012.[1] For the reasons set forth below, the Court awards judgment in favor of Plaintiffs on their six breach of Moratorium claims and awards judgment in favor of Defendants on Plaintiffs' claims for breach of Confidentiality. The Court further awards judgment in favor of Plaintiffs on Defendants' counterclaims for breach of contract and tortious interference with business relations.

### Statement of Facts ("SOF")

#### Joint Statement of Undisputed Facts

1. Plaintiff Atlantic Circulation, Inc. ("ACI") is a business engaged in the processing of magazine subscription orders.

---

[1] When citing to trial testimony, the Court will cite to the unofficial transcript. Should the parties order an official transcript, it is probable that the Court's citations to the unofficial transcript will not correspond to the pagination of the official transcript. For ease of citation, the Court has designated trial testimony from July 2, 2012 as Part I, testimony from July 3 as Part II, testimony from July 5 as Part III, and testimony from July 6 as Part IV.

2. Plaintiff Daniel W. Shoemaker III ("Shoemaker") is the President, founder and sole shareholder of ACI.

3. Defendant Midwest Circulations, LLC ("Midwest") is also a business engaged in the processing of magazine subscription orders.

4. Defendant Bridget Robbins is the managing member and majority owner of at least 80% of Midwest.

5. Midwest was formed on August 11, 2009.

6. ACI, Shoemaker, and Robbins were all parties in an earlier case pending in the United States District Court for the Middle District of Pennsylvania, consolidated into case number 1:08-CV-2063 (the "Initial Action"), over which Judge Caputo presided.

7. Mediation in the Initial Action occurred on July 29, 2009.

8. On September 29, 2009 [at 11:39 a.m.], Shawn Lau, counsel for Plaintiffs in this and the Initial Action, sent an e-mail to defense counsel which stated:

Per our telephone conversation of this date please be advised that The [sic] two women we discussed, Kiona [sic] Wright or Hays and Heather Smith are not and have not been clearing orders through ACI or Dan Shoemaker or Brandon Stice nor have they been associated with these parties in any business relationship. It is also my understanding that they are not traveling together or otherwise associating unless this is changed by mutual agreement of Stice and Robbins if such an agreement can be reached as per my subsequent phone conference with Cynthia Becker of this date.

9. Bridgett Robbins executed the Settlement Agreement on September 30, 2009.

2

10. Dan Shoemaker executed the Settlement Agreement on September 30, 2009.

11. The Settlement Agreement contains a moratorium against doing business with

    the other party's "Managers," and a confidentiality provision. Settlement

    Agreement, ¶¶ 7 and 9.

12. The Settlement Agreement defines "Manager" as:

    (1) A person, business entity, or unincorporated association who is either
    in a direct contractual relationship with the entity claiming (hereinafter
    "claiming entity") that person, business entity or unincorporated
    association as a manager; (2) is in a direct contractual relationship with a
    person, business entity, or unincorporated association who is in a direct
    contractual relationship with the claiming entity, or (3) is compensated by
    either the claiming entity, or a person, business entity or unincorporated
    association in a direct contractual relationship with the claiming entity, in
    a manner reasonably similar to other managers, as defined by this
    section, of the claiming entity.

13. The Settlement Agreement places an affirmative duty on the parties to disclose

    the terms of the moratorium to their individual Managers, and to require their

    Managers to abide by the terms of the moratorium. If a party to the agreement

    learns by any means that one of its Managers has breached, is attempting to

    breach, or is considering breaching the terms of the moratorium, "the party has a

    duty to take reasonable steps to end the breach or prevent the breach[.]"

    Settlement Agreement, ¶ 7(c).

14. The Settlement Agreement states that "if any Party to this Settlement Agreement

    is damaged by a breach of this Moratorium, any such breach will result in actual

    damages of at least $75,000." Settlement Agreement, ¶ 7(d).

3

15. The Settlement Agreement states that "[d]amages for breach of this Confidentiality Agreement are liquidated in an amount of $25,000." Settlement Agreement, ¶ 9(c).

16. Dan Shoemaker and ACI are bound by the terms of the Settlement Agreement.

17. Bridgett Robbins and Midwest are bound by the terms of the Settlement Agreement.

18. Shallone Sheets entered into an independent contractor agreement with ACI dated April 22, 2009, and executed between April 23 and April 29, 2009.

19. ACI cleared subscription orders for Shallone Sheets during the period of the Moratorium.

20. Shallone Sheets was a Manager of ACI under the Settlement Agreement.

21. Midwest accepted four subscription orders from Shallone Sheets on January 10, 2010.

22. In August 2010, Shallone Sheets returned to ACI, and again began clearing orders through ACI.

23. Donald Nelson entered into an independent contractor agreement with ACI dated January 29, 2010, and executed between February 3 and February 12, 2010.

24. ACI cleared subscription orders for Donald Nelson during the period of the Moratorium.

25. Donald Nelson was a Manager of ACI under the Settlement Agreement.

4

26. Midwest entered into a contract with Donald Nelson's company, E.M.A. Sales, on or about April 11, 2010. Midwest accepted subscription orders from E.M.A. Sales from April 15, 2010 to May 11, 2010 and at other points thereafter.

27. Justin Cowart entered into an independent contractor agreement with ACI dated December 29, 2009, and executed between January 2 and January 8, 2010.

28. ACI cleared subscription orders for Justin Cowart during the period of the Moratorium.

29. Justin Cowart was a Manager of ACI under the Settlement Agreement.

30. Justin Cowart stopped clearing orders through ACI in mid-February 2010.

31. Midwest entered into a contract with Justin Cowart's company, Millennium Sales, on or about March 8, 2010. Midwest accepted subscription orders from Millennium Sales beginning on March 11, 2010.

32. Brad Baker entered into an independent contractor agreement with ACI which is dated April 30, 2008, but was not executed until between September 29 and October 11, 2008.

33. ACI cleared subscription orders for Brad Baker during the period of the Moratorium.

34. Brad Baker was a Manager of ACI under the Settlement Agreement.

35. Midwest entered into a contract with Brad Baker's company, SLAP Sales, on or about April 7, 2010. Midwest accepted subscription orders from SLAP Sales beginning on April 1, 2010.

36. Bryan Fallin entered into an independent contractor agreement with ACI dated August 6, 2007, and executed between August 22 and September 22, 2007.

37. Bryan Fallin and Levi Gregg (the other member of Midwest) communicated prior to the time that Bryan Fallin contracted with Midwest.

38. Midwest entered into a contract with Bryan Fallin's company, Northwoods Marketing, on or about August 27, 2009. Midwest accepted subscription orders from Northwoods Marketing beginning on August 27, 2009.

39. Kenneth Rowe, Jr. entered into an independent contractor agreement with ACI dated October 29, 2008, and executed between October 31 and November 4, 2008.

40. Midwest entered into a contract with Cecilia Castleberry / Chi Sales on or about February 12, 2010. Cecilia Castleberry is Kenneth Rowe, Jr.'s girlfriend. Midwest accepted subscription orders from Cecilia Castleberry / Chi Sales from January 29, 2010 to May 25, 2010.

41. In June 2010, Kenneth Rowe, Jr. returned to ACI and again began clearing orders through ACI.

42. All of ACI's independent contractor agreements contain the following "Term and

Termination" clause in paragraph 25, which states in part:

The term of this Agreement is one (1) year from the date of execution and thereafter automatically renews one year thereafter until termination. [ACI] or Independent Contractor may terminate this Agreement at any time for any reason. Notice of termination shall be delivered in writing with proof of receipt to the other party.

43. Shallone Sheets, Donald Nelson, Justin Cowart, Brad Baker, and Kenneth Rowe,

Jr. did not provide ACI with written notice of termination of their respective

contracts with ACI.

44. Defendants never saw a written notice of termination for Bryan Fallin, Justin

Cowart, Brad Baker, Donald Nelson, Shallone Sheets, or Kenneth Rowe, Jr.'s

contracts with ACI.

45. Bridgett Robbins is a former independent contractor of ACI.

46. Bridgett Robbins executed an independent contractor agreement with ACI

through her company Success Unlimited, Inc. in July 2007.

47. Bridget Robbins' 2007 independent contractor agreement with ACI contained the

following non-compete clause:

Independent Contractor and its principals agrees [sic] that they will not during the period of three (3) years after their termination of such contractual relationship with the Company, for whatever cause, directly or indirectly, enter into the employment of or render any services to any person, partners, corporations or other entity engaged in the magazine business within the United States.

This clause was revised in later ACI contracts, specifically including those of

Sheets, Nelson, and Cowart to read:

Independent Contractor and its principals agree that they will not, during the period of three (3) years after the termination of their contractual relationship with Company for whatever reason, perform any services in the fields of magazine subscription solicitation, management of magazine subscription solicitation or magazine order processing anywhere in the United States. Independent Contractor and its principals further agree that they will not, during the period of three (3) years after the termination of their contractual relationship with Company for whatever reason, directly or indirectly enter into the employment of or render any services to any other person, partners, corporations or other entity engaged in the magazine solicitation business, the magazine order processing business or a management role in the magazine solicitation processing business within the United States.

48. Heather Smith executed an independent contractor agreement with Midwest on

or about August 30, 2009.

49. Kiana Hayes executed an independent contractor agreement with Midwest on or

about September 1, 2009.

50. Midwest cleared subscription orders for Kiana Hayes and Heather Smith during

the period of the Moratorium.

51. Brandon Stice / Blue Diamond was in a contractual relationship with ACI on July

29, 2009.

52. Brandon Stice / Blue Diamond was a Manager of ACI under the terms of the

Settlement Agreement.

53. On September 22, 2009, Blue Diamond ordered Greyhound bus tickets through

ACI for Kiana Hayes and Heather Smith to travel from Fayetteville, NC to

Albuquerque, NM.

54. Lacey Knight, doing business as Knight Sales, signed an independent contractor

agreement with ACI on November 9, 2009.

55. Lacey Knight / Knight Sales was a Manager of ACI during the moratorium period

set forth in the Settlement Agreement.

56. Bridgett Robbins disclosed the terms of the Settlement Agreement to Heather

Smith in August 2009.

57. On October 1, 2009, Bridgett Robbins sent an e-mail to her counsel stating the

following:

Brandon Stice and I have come to the agreement that Kiana can work for him for $8000.00 and a dozen roses sent to my hotel with a thank you card . . . installments of payment via moneygraham [*sic*] will be sent . . . $3000.00 today $3000.00 next Tuesday and $2,000.00 the following Tuesday.

## Court's Further Finding of Facts

58. The terms of the Moratorium are as follows:

any company owned or operated by . . . Bridgett Robbins . . . shall not hire, contract with, accept subscription orders from or otherwise enter into business relations with any Manager, as defined by this Settlement Agreement, of Atlantic Circulation, Inc., its principals or associated entities, who was a Manager of Atlantic Circulation, Inc. as of July 29, 2009 or who became, or shall become, a Manager of Atlantic Circulation, Inc. or any company owned or operated by Daniel W. Shoemaker, III,

9

during the time period beginning on July 29, 2009 and ending on July 28, 2010.

(Settlement Agreement, ¶ 7(b)).

59. Shoemaker sent out a written notice of termination to all of his contractors in November 2003 as part of a company reorganization. (Pl. Ex. 63).

60. Shoemaker received written notices of termination from Brandon Stice, Josiah Regan, and Jakob and Malissa Berlingeri in 2012. (Pl. Exs. 26, 27, 28).

61. After leaving ACI upon submitting written notice of termination via a discontinuance letter,[2] Fallin returned to ACI as a Manager for Blue Diamond. (Fallin Tr. Dep. at 26:7-9; Pl. Ex. 24).

62. When he returned to ACI as a Manager for Blue Diamond, Fallin executed a new Independent Contractor agreement with ACI for a term of one year with automatic renewal on November 30, 2008. (Pl. Ex. 24).

63. Rowe, Jr. submitted sales orders to Midwest through Chi Sales. (Pl. Ex. 11).

64. When Midwest hired Fallin in August 2009 and accepted orders from Rowe, Jr. in February 2010, Fallin and Rowe, Jr. were still Managers of ACI.

65. Heather Smith was a Manager when Robbins disclosed the terms of the Settlement Agreement. (Robbins T.T., Part IV, 71:2-8; Smith Tr. Dep. at 20:1-9, 22:8-10).

---

[2] Both Shoemaker and Robbins testified that discontinuances were used by sales agents and not Managers. (Shoemaker T.T., Part I, 56:19-22; Robbins T.T., Part III, 139:14-19)

66. Sales records from Smith's company, Tear It Up Sales, show the earliest sales activity from Smith began on August 27, 2009. (Pl. Ex. 43).

67. Hayes approached Knight and Stice about returning to work for Stice. (Hayes Tr. Dep. at 33:25-34:8; Smith Tr. Dep. 71:21-23; Knight Tr. Dep. at 51:14-20).

68. Stice initially did not want to re-hire Hayes, but he relented because Hayes begged him to take her back. (Stice Tr. Dep. at 32:20-23; 33:9-10; Knight Tr. Dep. at 51:14-20).

69. Stice initiated contact with Robbins about purchasing the rights to Hayes and Smith. (Stice Tr. Dep. at 33:9-10; 44:7-11; 45:10-18).

70. Shoemaker's phone records indicate he received three phone calls from Robbins on September 22, 2009 on his home business line and cell phone. (Def. Ex. 116).

71. Unable to reach Shoemaker directly on the 29th, Robbins left Shoemaker a voicemail message reminding him of the Moratorium clause in the Settlement Agreement. (Robbins T.T., Part IV, 77:10-14, 77:19-78:5; 87:4-10).

72. Shoemaker instructed Stice not to hire Hayes and Smith, but if he did, to ensure that the transaction was in writing. (Shoemaker T.T., Part I, 105:1-17; Stice Tr. Dep. at 55:22-56:5).

73. Shoemaker, Stice, Knight, and Smith understood that Smith was Hayes's sales

agent. (Shoemaker T.T., Part I, 107:5-6; Knight Tr. Dep. at 53:1-6; Stice Tr. Dep.

at 31:18-22; 37:11-13; 42:20-43:2; Smith Tr. Dep. at 44:2-3).

74. Plaintiffs' attorney, Cynthia Becker, sent the following e-mail to Robbins on

September 29, 2009 at 2:09 p.m.:

We have resolved the outstanding issues re: Brandon Stice stealing two of
Bridgett's managers. Surprisingly, Dan got into a major fight with Brandon
and told Brandon if he works either of the girls, Dan will not clear orders
for Brandon. Dan made Brandon send the girls home, and made his
position not to breach the settlement agreement very clear to Brandon and
his other managers. Brandon has since called Bridgett in an attempt to
purchase the managers' contracts. This is progress.

(Pl. Ex. 61).

75. In Defendants' response to Plaintiffs' Interrogatories, Defendants state that this

proposed sale of Kiana Hayes's contract included the Heather Smith contract, as

well.

State whether Midwest, Robbins, or Success Unlimited ever took part in
any communications relating to the sale or contracts of Kiana Hayes
and/or Heather Smith.

Yes, Ms. Robbins took part in communications relating to the possible
sale of the contracts of Kiana Hayes and Heather Smith; however, the
sale of Ms. Hayes and Ms. Smith's contracts was never consummated.

(Pl's Interrogatories, Pl. Ex. 15, ¶ 5).

76. Robbins sent the following draft agreement, dated September 30, 2009, to Stice:

I, Bridgett Robbins, agree to sell the contract of Kiana Wright (Hays)
currently contracted through Midwest Circulations LLC, a company owned

12

and operated by Bridgett Robbins, to Brandon Stice of Blue Diamond Subscriptions (clearing thru Atlantic Circulations Inc.) for the face value of $8,000.00. First installment of payments are due by October 1st, 2009 in the amount of $3,000 payable in the form of MoneyGram to Bridgett Robbins. The next installment will be due the following Tuesday. Thereafter, final payment will be collected no later than the 31st day of October. In addition, there will be a dozen roses with a thank you card sent to the hotel where Bridget Robbins resides. By selling Kiana Wright (Hays)' contract, there will be no violation or stipulations of the agreement made by the court in Middle District of Pennsylvania. If payments are not made by the dates given, this agreement is void.

(Pl. Ex. 16; Stice Tr. Dep. at 46:5-8).

77. After Robbins drafted and signed an agreement, she faxed it to Stice. However,

Stice never returned a signed agreement to Robbins. (Robbins T.T., Part IV,

91:6-93:7; Stice Tr. Dep. at 49:4-11).

78. Stice never paid the $8,000 due on the Stice-Robbins agreement because when

Hayes and Smith arrived, it was clear to him that they were drug addicts. (Stice

Tr. Dep. 30:17-21; 48:17-21; 49:4-11; 50:8-12; 51:16-21).

79. Shoemaker was unaware that Stice never paid $8,000 due on the Stice-Robbins

agreement. (Shoemaker T.T., Part I, 123:7-11; Shoemaker T.T., Part II, 66:13-

20; 68:15-24).

80. Shoemaker has no control over the operations of his independent contractors.

(Shoemaker T.T., Part II, 24:23-25:13; see, e.g., Pl. Ex. 50, ¶ 1).

## Conclusions of Law

1. Defendants breached the Settlement Agreement when they accepted orders from Baker, Cowart, Fallin, Nelson, Rowe, Jr., and Sheets during the Moratorium.

2. Defendant Robbins did not breach the Confidentiality provision of the Settlement Agreement when she disclosed the terms of the Agreement to Smith.

3. Brandon Stice and Blue Diamond were not acting as agents of Plaintiff Shoemaker when Stice was negotiating with Defendant Robbins for the rights to Hayes and Smith.

4. Plaintiff Shoemaker took reasonable measures to ensure that his Manager, Stice, did not breach the Settlement Agreement by hiring Hayes and Smith from Defendants. Because of these reasonable measures, Plaintiffs did not breach the Settlement Agreement.

5. Defendant Robbins waived her rights to enforce a breach of the Moratorium by agreeing to sell her contractual rights to both Hayes and Smith to Stice.

6. Neither Plaintiffs nor their agent (Attorney Lau) fraudulently induced Robbins to sign the Settlement Agreement.

7. Plaintiffs did not breach the Confidentiality provision of the Settlement Agreement when they temporarily attached the Agreement as an exhibit to their initial Complaint.

8. Plaintiffs did not tortiously interfere with Defendants' contracts with Hayes and Smith.

## Introduction

Because this is a diversity action alleging state law breach of contract and tort claims, the case is governed by Pennsylvania law. *Nat'l City Mortgage Co. v. Stephen*, 647 F.3d 78, 82 (3d Cir. 2011) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

## Breach of Contract Claims

Each side claims the other breached key terms of the Settlement Agreement: namely, the Moratorium and Confidentiality provisions.

### Moratorium

#### Defendants' Alleged Breach

To establish a breach of contract claim in Pennsylvania, one must prove: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010). "[S]ettlement agreements are governed by contract law principles." *Lesko v. Frankford Hosp.-Bucks Cnty.*, 15 A.3d 337, 341-42 (Pa. 2011). Because it is undisputed that the Settlement Agreement applies to this action and because the Agreement contains liquidated damages provisions (SOF ¶¶ 14, 15), the focus of the Court's analysis will be on the second element: breach of duty.

15

Plaintiffs claim that Defendants hired Baker, Cowart, Fallin, Nelson, Rowe, Jr., and

Sheets during the Moratorium in breach of the Settlement Agreement. Midwest cleared

orders for Baker, Cowart, Nelson, and Sheets during the Moratorium. (SOF ¶¶ 21 (Sheets),

26 (Nelson), 31 (Cowart), 35 (Baker)). The Joint Statement of Facts also states that these

four were Managers of ACI under the Settlement Agreement. (SOF ¶¶ 20 (Sheets), 25

(Nelson), 29 (Cowart), and 34 (Baker)).

Under the plain terms of the Settlement Agreement, the Court finds that these

admissions alone attach contractual liability to Defendants. Under the express terms of the

Settlement Agreement,

> any company owned or operated by . . . Bridgett Robbins . . . shall not hire, contract with, accept subscription orders from or otherwise enter into business relations with any Manager, as defined by this Settlement Agreement, of Atlantic Circulation, Inc., its principals or associated entities, *who was a Manager of Atlantic Circulation, Inc. as of July 29, 2009* or who became, or shall become, a Manager of Atlantic Circulation, Inc. or any company owned or operated by Daniel W. Shoemaker, III, during the time period beginning on July 29, 2009 and ending on July 28, 2010.

(SOF ¶ 58) (emphasis added).

That is, anyone who was a Manager of ACI as of July 29, 2009 or afterwards was off

limits to Defendants, regardless of whether they terminated their contracts in writing.

Because the Court finds that Fallin and Rowe, Jr. were also ACI Managers during the

moratorium period (*see infra*), under the terms of the Settlement Agreement, liability

attaches to Defendants for accepting orders from Rowe, Jr. and Fallin, as well.

16

However, at oral argument, Attorney Lau stated that for contractual liability to attach, the breaching party would have to hire a Manager during the Moratorium without that Manager having submitted a written notice of termination. (Tr. of Oral Arg. at 9:18-25).[3] Even under this standard, Plaintiffs have proven their case. Defendants concede that these Baker, Cowart, Nelson, and Sheets never tendered written notices of resignation. (SOF ¶ 43). Therefore, Plaintiffs have proven their breach of contract claims with respect to these four Managers.

Defendants argue that Plaintiffs waived the requirement of written notice by a course of conduct. "[S]ubsequent modifications or waivers can be shown either by express agreement or actions which necessarily involve such alterations." *Malesh v. Chechak*, 493 A.2d 106, 109 (Pa. Super. Ct. 1985) (citing *Wagner v. Graziano Constr. Co.*, 136 A.2d 82, 84 (Pa. 1957)). Defendants cite to testimony from Shoemaker saying that he "suspected that" he has accepted verbal notice from his contractors in the past. However, he immediately followed that statement with "I cannot for the life of me at this moment think of an example." (Def. Ex. 95, 107:11-108:9). This statement is hardly proof of a course of conduct which tolerated the use of verbal notice of terminations.

There is also evidence that Shoemaker followed his own requirements of written notice of termination. Shoemaker sent out a written notice of termination to all of his contractors in November 2003 as part of a company reorganization. (SOF ¶ 59). He also

---

[3] This transcript is also unofficial, so any citations likely will be different from the pagination of the official transcript.

17

received written notices of termination from Brandon Stice, Josiah Regan, and Jakob and Malissa Berlingeri in 2012. (SOF ¶ 60).

Moreover, the Court does not see the relevance of Shoemaker's course of conduct with other contractors when each of the Independent Contractor Agreements with Baker, Cowart, Nelson, and Sheets explicitly required written notice of termination from either side before the contract would be terminated. (SOF ¶ 42). The Court concludes that Defendants have not proven that Shoemaker waived the requirement of written notice in his business dealings either with the four Managers at issue (Baker, Cowart, Nelson, and Sheets) or in his dealings with other Independent Contractors. Therefore, there is little difficulty determining that Defendants breached the Settlement Agreement when they hired Baker, Cowart, Nelson, and Sheets during the Moratorium.

Defendants contend that Fallin and Rowe, Jr. were no longer Managers of ACI when Midwest hired them. The basis for this argument is that though neither Fallin nor Rowe, Jr. submitted a written notice of resignation, neither had cleared any orders with ACI for a significant period of time before joining Midwest. Defendants attempt to show that inactivity in a contractor's sales accounts can constitute termination, a variant of their argument above.[4]

Fallin had signed an Independent Contractor agreement with ACI on August 22, 2007. (SOF ¶ 36). After leaving ACI upon submitting written notice of termination via a

---

[4] Fallin testified that "it's just an unspoken thing throughout the hotel with my crew, that in order to leave one company, you have to leave that company and then like three to six months later, you can go to another sales company." (Fallin Tr. Dep. at 19:17-21).

discontinuance letter, Fallin returned to ACI as a Manager for Blue Diamond, which itself was an Independent Contractor of ACI.[5] (SOF ¶¶ 51, 52, 61). When he returned to ACI as a Manager for Blue Diamond, Fallin executed a new Independent Contractor agreement with ACI for a term of one year on November 30, 2008. (SOF ¶ 62).

At trial, the Court conditionally sustained Defendants' objection to the admission of the Stice-Fallin Independent Contractor agreement because Shoemaker was not a party to the contract and was unable to lay a foundation for the evidence. The Court's ruling was conditioned on its reading of the Stice and Fallin depositions. (Shoemaker T.T., Part I, 74:22-75:3). Upon reading their depositions, the Court finds that neither Stice nor Fallin authenticated the Independent Contractor agreement between them at their depositions in that neither was shown a copy of the agreement itself. However, the Court is satisfied that their combined testimony satisfies the requirements of both FED. R. EVID. 901(b)(3) ("comparison with an authenticated specimen by . . . the trier of fact.") and FED. R. EVID. 901(b)(4) ("[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.").

> [T]he showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility. Rather, there need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the [fact-finder] and it is the [fact-finder] who will ultimately determine the authenticity of the evidence. The only requirement is that there has been substantial evidence from which [the fact-finder] could infer that the document was authentic.

---

[5] Stice and Blue Diamond are no longer Managers of ACI. Stice tendered his written notice of termination in January 2012. (SOF ¶ 60; Shoemaker T.T., Part I, 88:5-14).

19

Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 928 (3d Cir. 1986). A document can be "properly authenticated pursuant to Rule 901, either by direct testimony or by the contents of the documents themselves." Id. at 927. That is, the "[t]estimony of a witness with personal knowledge is sufficient." United States v. Bansal, 663 F.3d 634, 667 (3d Cir. 2011) (finding that a comparison with already authenticated and admitted exhibits was proper to determine another exhibit's authenticity).

Both Stice and Fallin acknowledged that there had been a written agreement. Fallin testified that he signed an agreement with Blue Diamond three days after Thanksgiving in 2009, though he later corrected himself and said the agreement was in 2008. (Fallin Tr. Dep. at 16:23-17:3; 28:12-18; 31:20-24). Stice also testified that he signed an agreement with Fallin, and though he did not have a copy of the agreement with him at the deposition, he stated it was "the exact same contract" with slight changes in font and party names. (Stice Tr. Dep. 93:15-95:1). After comparing the Stice-Fallin agreement with other ACI Independent Contractor agreements, and comparing the signatures of Stice and Fallin to other documents bearing their signatures, the Court is satisfied that the proffered Stice-Fallin Independent Contractor agreement is authentic, as well as admissible.

Following a period of inactivity with ACI, Fallin signed an Independent Contractor agreement with Midwest on August 27, 2009 on behalf of his company, Northwoods Marketing. (SOF ¶ 38). Fallin testified that he gave Stice verbal notice of termination two weeks in advance. (Fallin Tr. Dep. 27:24-25). He sold no subscriptions through Blue

20

Diamond or any other entity from New Year's Day of 2009 until August 2009, when he joined Midwest. (Id. at 32:1-13).

Meanwhile, Rowe had signed an Independent Contractor agreement with ACI for a term of one year with automatic renewal on October 31, 2008. (SOF ¶ 39). According to his sales records at ACI, the last order he submitted to ACI before moving to Midwest was on July 21, 2009. (Pl. Ex. 33; Shoemaker T.T., Part I, 49:21-50:2). Rowe's girlfriend, Cecilia Castleberry, signed an Independent Contractor agreement with Midwest on February 12, 2010 on behalf of Castleberry's sales organization, Chi Sales. (SOF ¶ 40). Rowe submitted sales orders to Midwest through Chi Sales. (SOF ¶ 63).

If the Court were to accept Defendants' argument that a period of inactivity can constitute termination, then any period (of unspecified length) of inactivity could constitute termination of a contractual relationship. This cannot be. Therefore, the Court finds that when Midwest hired Fallin in August 2009 and accepted orders from Rowe, Jr. in February 2010, they were still Managers of ACI. (SOF ¶ 64).

As such, they were subject to the Settlement Agreement's Moratorium clause. It matters not that Fallin was hired before the Settlement Agreement was formally signed because this portion of the Agreement was retroactive to July 29, 2009. (SOF ¶ 58). Therefore, when Defendants accepted subscription orders from Fallin and Rowe, Jr. during the Moratorium, they breached the Settlement Agreement.

21

## Plaintiffs' Alleged Breach

Brandon Stice and his company, Blue Diamond, LLC, were formerly Managers of

ACI. (SOF ¶¶ 51, 52). Defendants claim that Plaintiffs hired Hayes and Smith during the

Moratorium in breach of the Settlement Agreement. The Court rejects this contention

because the evidence shows that Robbins had agreed to sell the contracts of Hayes and

Smith to Brandon Stice, under the business name, Blue Diamond. Her written agreement

with Stice constituted a waiver of her right to sue for breach of contract (Settlement

Agreement) against Shoemaker. *See Malesh v. Chechak*, 493 A.2d 106, 109 (Pa. Super.

Ct. 1985) ("waivers can be shown either by express agreement or actions. . .") (citing

*Wagner v. Graziano Constr. Co.*, 136 A.2d 82, 84 (Pa. 1957)).

Robbins agreed to sell the Kiana Hayes contract to Stice for $8,000 and a dozen

roses, though Stice never returned a signed agreement. (SOF ¶ 77). Robbins sent the

following signed draft agreement, dated September 30, 2009, to Stice:

I, Bridgett Robbins, agree to sell the contract of Kiana Wright (Hays) currently contracted through Midwest Circulations LLC, a company owned and operated by Bridgett Robbins, to Brandon Stice of Blue Diamond Subscriptions (clearing thru Atlantic Circulations Inc.) for the face value of $8,000.00. First installment of payments are due by October 1st, 2009 in the amount of $3,000 payable in the form of MoneyGram to Bridgett Robbins. The next installment will be due the following Tuesday. Thereafter, final payment will be collected no later than the 31st day of October. In addition, there will be a dozen roses with a thank you card sent to the hotel where Bridget Robbins resides. By selling Kiana Wright (Hays)' contract, *there will be no violation or stipulations of the agreement made by the court in Middle District of Pennsylvania.* If payments are not made by the dates given, this agreement is void.

(SOF ¶ 76) (emphasis added). Under this agreement, Robbins expressly waived any rights

she had under the Settlement Agreement to Hayes and Smith.[6] She also sent a

confirmation e-mail to Attorney Becker on October 1, 2009 saying:

> Brandon Stice and I have come to the agreement that Kiana can work for him
> for $8,000.00 dollars and a dozen roses sent to my hotel with a thank you
> card. . . installments of payment via moneygraham [sic] will be sent. . .
> $3,000.00 today, $3,000.00 next Tuesday and $2,000.00 the following
> Tuesday.

(SOF ¶ 57).

Though the draft agreement and e-mail from Robbins to Attorney Becker refer to

only Kiana Hayes, in Defendants' response to Plaintiffs' Interrogatories, Defendants admit

that this proposed sale of Kiana Hayes's contract included Heather Smith, as well.

> State whether Midwest, Robbins, or Success Unlimited ever took part in any
> communications relating to the sale or contracts of Kiana Hayes and/or
> Heather Smith.

> Yes, Ms. Robbins took part in communications relating to the possible sale of
> the contracts of Kiana Hayes and Heather Smith; however, the sale of Ms.
> Hayes and Ms. Smith's contracts was never consummated.

(SOF ¶ 75). Given that this is an admission, the Court does not credit Robbins's testimony

that she refused to sell Smith's contractual rights to Stice. (Robbins T.T., Part IV, 88:20-25).

Rather, the exchange of e-mails between 1) Attorney Lau and Attorney Becker and

2) Attorney Becker and Robbins shows that the parties understood that the proposed sale

---

[6] Even if the Court were to conclude the draft was ambiguous, under Pennsylvania law, "[w]hen an ambiguity exists, it will be construed against the drafter of the contract." *Clairton Slag, Inc. v. Dep't of Gen. Servs.*, 2 A.3d 765, 773 (Pa. Commw. Ct. 2010). Therefore, whether the terms of the draft were ambiguous or not, the Court would either interpret the draft as an express waiver of Robbins's rights or would construe the draft against her.

23

included both Hayes and Smith. In the morning of September 29, Attorney Lau confirmed to

Attorney Becker that neither Hayes nor Smith had been working for ACI and they would not

do so "unless this has changed by mutual agreement of Stice and Robbins."

> Dear Cynthia and Bruce, as per our telephone conversation of this date, pease [sic] be advised that [t]he two young women we discussed Ki[a]na Wright or Hayes and Heather Smith are not and have not been clearing orders for ACI or Dan Shoemaker or Brandon Stice nor have they been associated with these parties in any business relationship. It is also my understanding that they are not traveling together or otherwise associating unless this has changed by mutual agreement of Stice and Robbins if such an arrangement can be reached as per my subsequent phone conference w[i]th Cynthia Becker of this date.

(SOF ¶ 8). Later that afternoon, Attorney Becker sent the following e-mail to Robbins:

> We have resolved the outstanding issues re: Brandon Stice stealing two of Bridgett's managers. Surprisingly, Dan got into a major fight with Brandon and told Brandon if he works either of the girls, Dan will not clear orders for Brandon. Dan made Brandon send the girls home, and made his position not to breach the settlement agreement very clear to Brandon and his other managers. Brandon has since called Bridgett in an attempt to purchase the managers' contracts. This is progress.

(SOF ¶ 74). It is clear from Attorney Lau's e-mail, that any potential agreement would cover

both Hayes and Smith. Attorney Becker's e-mail is even more explicit in that she refers to

the "two" women as "managers." Given that the parties defined "Manager" in a way

explicitly different from the traditional meaning of the word in employment circumstances,

the Court does not view this characterization of Hayes and Smith as a mistake on Attorney

Becker's part.

At the time, Shoemaker understood that Hayes was a Manager and Smith was her sales agent. (SOF ¶ 73). Lacey Knight, Stice, and Smith also characterized Smith as Hayes's sales agent. (Id.). Stice clarified the $8,000 covered "Kiana's company and anything that would be assessed to her like if she had a crew van or if she had agents. No, I doubt – doubtfully would have just given $8,000 to an individual person. No. It was her and her downline." (Stice Tr. Dep. at 31:18-22; SOF ¶ 73). Stice also said, "I never was told that Heather was a manager. Heather works for Kiana from what I understand." (Stice Tr. Dep. at 37:11-13; SOF ¶ 73).

> First of all, we never discussed Heather, because of the fact that Heather portrayed herself as an agent of Kiana's and any agents would be part of Kiana's agreement due to [...] fact that Kiana is the sole provider. And I mean, you know as well as I do, that when you're the crew manager you're also the crew owner. And so, therefore, I never questioned her agents.

(Stice Tr. Dep. at 42:20-43:2; SOF ¶ 73). Smith corroborated this testimony: "Kiana was Brandon's original agent, and I was her original agent." (Smith Tr. Dep. at 44:2-3; SOF ¶ 73). Though Smith's status as a Manager or a sales agent is immaterial to the analysis of the scope of the Stice-Robbins agreement,[7] the Lau and Becker e-mails and the overwhelming trial testimony show that the agreement covered both Hayes and Smith. Thus, Robbins waived her rights to both Hayes and Smith.

---

[7] If Smith were a Manager, then Robbins waived her contractual right to enforce the terms of the Settlement Agreement against Plaintiffs with respect to Smith. If Smith were an agent, then the Settlement Agreement would not apply at all, and Defendants could not recover for breach of contract. The above evidence is cited merely to show that all parties agreed that the Stice-Robbins agreement encompassed both Hayes and Smith.

It is also clear that Stice never returned a signed agreement or paid the $8,000 due to Robbins. (SOF ¶¶ 77, 78). Stice testified that he did not pay the $8,000 because when Hayes arrived in New Mexico, it was clear that she was a drug addict. "I had to pretty much let her do rehab again. You know, I can't just shell out eight grand on a girl who has lost a hundred pounds since last time I saw her. I just can't do that, and Bridget knew it." (Stice Tr. Dep., 30:17-21; SOF ¶ 78). "I agreed to give $8,000 to the Kiana that I knew as Kiana. You can't send me a bag with bones in it with bags under your eyes. I ain't paying eight thousand for that. Okay? It would cost more in rehab for that girl. I can't do it." (Stice Tr. Dep. at 48:17-21). Stice also said, "I'm sorry I broke the agreement. . . . I mean, I still had a deal with Bridget and she knows as well as I do that, you know, you can't get water from a rock, you know." (Id. at 50:8-12; see also 51:16-21). Thus, Stice admits that he did not pay the $8,000 he agreed to pay Robbins because he claims he did not receive the expected benefit of his bargain.

If Robbins were suing Stice, she may have had a valid claim against him for breach of contract. Precisely why Shoemaker and ACI should be responsible for Stice's non-payment is unclear to the Court. Defendants argue that Shoemaker was obligated under the Settlement Agreement to prevent any breaches of the Settlement Agreement by any of his Managers, which included Stice and Blue Diamond. Notwithstanding the Court's determination that Robbins waived her rights under the Settlement Agreement to Hayes and Smith, the Settlement Agreement does not require either party to *guarantee* that each side's

Managers will not breach the Agreement. Instead, it requires only that Shoemaker and Robbins take "reasonable steps" to ensure that no Manager breaches the Settlement Agreement. (SOF ¶ 13) ("the party has a duty to take reasonable steps to end the breach or prevent the breach[.]"). The Court finds Shoemaker met his obligations under the Settlement Agreement and will not impose on him a duty to guarantee non-breaches by his Managers.

Shoemaker testified that he did not recall receiving a voicemail from Robbins on September 22, 2009 regarding Hayes and Smith traveling with Stice, (Shoemaker T.T., Part II, 33:16-20), even though his phone records indicate that he did receive a phone call from her on his home business line and his cell phone. (SOF ¶ 70). Robbins also testified that she placed three calls to Shoemaker on September 22, 2009, but she never spoke with him directly and left him a voicemail instead. (SOF ¶ 71). Robbins called Stice to remind him that under the Settlement Agreement, there was a Moratorium in place. (Id.).

Nevertheless, upon receiving an inquiry from counsel as to whether Hayes and Smith were working for ACI, Shoemaker contacted Stice to confirm the two women's status.

> [Stice] assured me that they were not [working for Blue Diamond], and he also assured me that he wouldn't [hire them]. I then heard back, I think, one more time that there was a negotiation between Mr. Stice and Ms. Robbins to acquire these two individuals. And I made it clear to Mr. Stice that, you know, unless you get some kind of formal agreement between yourself and -- you know, Blue Diamond and Ms. Robbins and Midwest that would be a violation of the settlement agreement and not to do that. I then -- I then heard -- I think that there was an agreement reached between Mr. Stice and Ms. Robbins.

(SOF ¶ 72; Shoemaker T.T., Part I, 105:1-17). In fact, Shoemaker testified that Robbins

would not sign the Settlement Agreement unless the issue of Hayes and Smith "was taken

care of." (Id. at 106:21-25).[8]

Stice's testimony also absolves Shoemaker of any liability:

I told [Shoemaker] they were coming out. . . . I just told him they were coming
out. I sent him a copy of the contract. He said not to do it, but – he said if I
do do it, just make sure that I uphold my end. And I kinda f*cked that up. But
that's all that we pretty much talked about as far as Kiana coming, I guess.

(Stice Tr. Dep. at 55:22-56:5). According to Stice, neither Hayes nor Smith was clearing

orders for him as of September 29, 2009, because they were both "staying high." (Id. at

64:19-20).

The evidence shows that Shoemaker did not follow up with Stice, so he was

unaware that Stice never paid Robbins the $8,000 due on the contract (SOF ¶ 79), but the

Court will not impose liability on Shoemaker for failure to guarantee a prevention of what

Defendants view as Stice's breach of the Settlement Agreement. This is especially so in

light of Stice's testimony that "managers are private contractors" (Stice Tr. Dep. at 23:4-5),

and Shoemaker's testimony that he has no control over the operations of his Independent

Contractors or their sales crews. (SOF ¶ 80). Stice was not acting as Shoemaker's agent,

as stated in Stice's Independent Contractor agreement with ACI. "Neither party hereto is

authorized to act or represent itself as an agent of the other for any purpose. . . . [ACI] does

---

[8] See also Robbins T.T., Part IV, 79:16-25.

not have any control over the manner and means and personnel Independent Contractor

selects to perform its services."[9] (Id.).

Defendants claim that the September 29, 2009 e-mail from Attorney Lau to Attorney

Becker fraudulently induced Robbins to sign the Settlement Agreement. But for that e-mail,

Robbins claims she never would have signed the Settlement Agreement. To prove

fraudulent inducement under Pennsylvania law, Plaintiff must prove the following elements:

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa. Super. Ct.

2005). A plaintiff must prove the elements of fraud with clear and convincing evidence.

EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 275-76 (3d Cir. 2010) (citing Skurnowicz v.

Lucci, 798 A.2d 788, 793 (Pa. Super. Ct. 2002)).

Attorney Lau's e-mail to Attorney Becker from the morning of September 29, 2009

states that Hayes and Smith "are not and have not been clearing orders through [Plaintiffs]

or Brandon Stice nor have they been associated with [them] in any business relationship. It

is also my understanding that they are not traveling together or otherwise associating unless

---

[9] Robbins testified that when the agreement with Stice fell through, in October 2009 she contacted Shoemaker to demand that Stice cease any attempt to work Hayes and Smith. She conceded that she never spoke to Shoemaker directly regarding the voided agreement with Stice. (Robbins T.T., Part III, 206:11-14). She stated, however, that using one of her sales agent's cell phones (she could not remember which agent), she left Shoemaker a voicemail regarding Stice-'s nonpayment. There is no record evidence of such a phone call, and Robbins acknowledged that she had "no proof of that" call to Shoemaker. (Id. at 217:1-13; 218:9-23; 220:1-221:3; Pl. Ex. 74). As such, the Court will not credit her testimony that Shoemaker was aware of Stice's failure to pay the agreed-upon $8,000 to Robbins.

29

this is changed by mutual agreement of Stice and Robbins." (SOF ¶ 8). Based on this information alone, it is difficult to determine the source of Attorney Lau's information, but ultimately, that information would have stemmed from Stice.

In an attempt to show the falsity of Attorney Lau's statements, Defendants make much of bus tickets that Blue Diamond purchased for Hayes and Smith on September 22, 2009 and September 29, 2009. (Pl. Ex. 41, 42). The first set of tickets was from Fayetteville, North Carolina to Albuquerque, New Mexico, and the second set of tickets was from Albuquerque to Las Cruces, New Mexico. (*Id.*). Though the tickets were purchased through ACI, Shoemaker explained that ordering bus tickets was a service ACI provided to its Independent Contractors, "but we never paid for the travel expenses. They are all charged to the independent contractor." (Shoemaker T.T., Part II, 31:15-17).

Though the undersigned expressed strong doubts as to the relevance of such evidence, at trial, each side presented much testimony over how long it would have taken Hayes and Smith to travel from North Carolina to New Mexico and the precise date and location when the two caught up with Stice's sales crew. Defendants still have not shown how this testimony is relevant because regardless of when and where Hayes and Smith met up with Stice's sales crew, there is no record evidence that either Attorney Lau or Shoemaker had independent personal knowledge of whether Hayes and Smith were in a business relationship Stice when Stice and Robbins were negotiating for the rights to Hayes and Smith. Both would have relied entirely on Stice's representations as to the status of

Hayes and Smith. Further undermining Robbins's argument of fraudulent inducement is her admission at trial that she never saw the e-mail from Attorney Lau prior to trial. (Robbins T.T., Part III, 201:24-203:4). Rather, she relied on statements from Stice that though Hayes and Smith were in his hotel, he was "sending them home." (Id. at 203:5-204:7).

There is no evidence that would indicate that Attorney Lau made false statements, was reckless with respect to the truth of his statements, or that he intended to mislead Robbins through those statements. Thus, assuming for the moment that the statements in Attorney Lau's e-mail were untrue and Robbins was aware of Attorney Lau's statements without having seen the e-mail, Defendants have failed to show by clear and convincing evidence that Plaintiffs' agent fraudulently induced Robbins to sign the Settlement Agreement.

Therefore, the Court finds that Plaintiffs did not breach the Moratorium provision of the Settlement Agreement. As such, it is unnecessary to determine "who breached first,"[10] thereby causing an inquiry as to whether the initial breach relieved the non-breaching party of any obligation to perform, because only one party breached the Moratorium provision of the Settlement Agreement – the Defendants.

## Confidentiality

### Defendants' Alleged Breach

---

[10] "A material breach of a contract relieves the non-breaching party from any continuing duty of performance" under the contract. LJL Trans., Inc., v. Pilot Air Freight Corp., 962 A.2d 639, 648 (Pa. 2009).

Plaintiffs claim that Defendants breached the Confidentiality provision numerous times. The parties do not dispute that Robbins disclosed the terms of the Settlement Agreement to Heather Smith in August 2009. (SOF ¶ 56; Robbins Trial Test, Part III, 180:23-181:5). The evidence shows that Smith did not execute her Independent Contractor agreement with Midwest until August 30, 2009. (SOF ¶ 48; Robbins Trial Test, Part III, 166:8-22). Thus, Plaintiffs argue that Robbins divulged the terms of the Settlement Agreement *before* Smith was a Manager of Midwest.

Robbins argues that though there was no formal Independent Contract between Midwest and Smith, there was an oral contract in place with Smith acting as an Independent Contractor (SOF ¶ 65) because Midwest was not formed until August 11, 2009. (SOF ¶ 5). Smith testified in her trial deposition that in July 2009 when she learned of the one-year Moratorium between Shoemaker and Robbins, she (Smith) was a Manager for Robbins. (SOF ¶ 65). Though Smith testified that Robbins told her that Smith's promotion to Manager was contingent on Smith "writ[ing] consistent business," (Smith Tr. Dep. at 89:4-9) Smith said that she was one of two people who were promoted to Manager "[b]ecause all her other managers that she had when she went to Midwest were already managers for her underneath Family Subscriptions. Me and Nicki was [*sic*] the only ones that she promoted when she switched over." (*Id.* at 90:1-4).

According to Robbins, she and Smith each understood that a contract would be in place once Midwest was incorporated. In support of this contention, Robbins testified that

she allowed Smith to bring her daughter on the road with the Midwest sales team, and only

Managers were permitted to bring children on the road. (Robbins T.T., Part IV, 71:18-72:7).

Sales records from Smith's company, Tear It Up Sales, show the earliest sales activity from

Smith began on August 27, 2009. (SOF ¶ 66).

It appears from the testimony of both Robbins and Smith that each considered Smith

to be a Manager when Smith came on to Midwest. Under the express terms of the

Settlement Agreement, between July 29, 2009 and July 28, 2010,

> any company owned or operated by . . . Bridgett Robbins . . . shall not hire, contract with, accept subscription orders from or otherwise enter into business relations with any Manager, *as defined by this Settlement Agreement*, of Atlantic Circulation, Inc., its principals or associated entities, who was a Manager of Atlantic Circulation, Inc. as of July 29, 2009 or who became, or shall become, a Manager of Atlantic Circulation, Inc. or any company owned or operated by Daniel W. Shoemaker, III, during the time period beginning on July 29, 2009 and ending on July 28, 2010.

(SOF ¶ 58) (emphasis added). In turn, Manager is defined as:

> (1) A person, business entity, or unincorporated association who is either in a *direct contractual relationship with the entity claiming* (hereinafter "claiming entity") that person, business entity or unincorporated association as a manager; (2) is in a direct contractual relationship with a person, business entity, or unincorporated association who is in a direct contractual relationship with the claiming entity, or (3) is compensated by either the claiming entity, or a person, business entity or unincorporated association in a direct contractual relationship with the claiming entity, in a manner reasonably similar to other managers, as defined by this section, of the claiming entity.

(SOF ¶ 12) (emphasis added).

Plaintiffs argue that Robbins is attempting to re-define "Manager" in a manner that is

inconsistent with the definition contained within the Settlement Agreement. To the extent

33

that Defendants argue that a Manager is someone who can bring her child on the road with her, the Court agrees with Plaintiffs. The Court notes that nowhere in this agreement is there any mention of a Manager being defined as one who is allowed to bring his/her child "on the road." Being permitted to bring one's child on the road may very well have been a "perk" of the job, but having the ability to bring one's child on the road is not what defines a Manager; it is merely a side benefit of having the title of Manager.

Nevertheless, the Court finds that Smith was a Manager when Robbins disclosed the terms of the Settlement Agreement to her.[11] "Where the parties have agreed on the essential terms of a contract, the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement." *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999); *see also Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009) (concluding that though "an agreement to enter into a binding contract in the future does not alone constitute a contract, . . . parties may bind themselves contractually although they intend, at some later date, to draft a more formal document.") (citing *Goldman v. McShain*, 247 A.2d 455, 459 (Pa. 1968)) (all other internal citations and quotation marks omitted).

---

[11] The Court finds that Smith was a Manager for Defendant Midwest for the purpose of determining Smith's status at the time of Robbins's disclosure to Smith of the terms of the Settlement Agreement. At the time Robbins was negotiating the sale of the contracts for Hayes and Smith to Stice, it appears that all parties understood that Smith was Hayes's agent. The Court noted above that Smith's status during the Stice-Robbins negotiations was immaterial. If the Court had found that Smith would be brought on as Hayes's sales agent at Blue Diamond, there would be no inconsistency between that finding and the Court's finding that Smith was a Manager at Midwest.

The evidence shows that though Robbins and Smith did not execute a written Independent Contractor agreement until August 30, 2009, they had an oral agreement that Smith was a Manager and they would execute a written contract after Midwest was incorporated. An oral agreement existed until August 30, 2009, when the parties "formalize[d] their agreement in writing." All that the Settlement Agreement requires is that there exist a "direct contractual relationship" between Robbins and Smith for the latter to be a Manager. The Settlement Agreement did not require such a "direct contractual relationship" to be reduced to writing.[12] Because Plaintiffs bear the burden of proving a breach, and the Court finds that Smith was a Manager when Robbins disclosed the contents of the Settlement Agreement to her, the Court rejects Plaintiffs' breach of Confidentiality claim.

Plaintiffs also contend that Robbins breached the Confidentiality provision of the Settlement Agreement when she disclosed some of the terms of the agreement to Katie Behlke in or around July 2011. (Behlke Tr. Dep. at 7:11-19). Behlke testified in her trial deposition that Robbins had told her that under the Settlement Agreement, Shoemaker had not won any money from Robbins and that no parties to the Agreement would be allowed to hire Managers from any other party for a certain period of time. (Id. at 8:1-8). Behlke also testified that Robbins disclosed the terms of the Agreement to other people, including

---

[12] In finding that Smith was a Manager and thus entitled to know of the terms contained in the Settlement Agreement, the Court does not reach Defendants' argument that only the Moratorium provisions were retroactive to July 29, 2009, whereas the remainder of the Settlement Agreement became enforceable on September 30, 2009 when both Shoemaker and Robbins signed it.

James Gates, Nicole Lee, and others. (*Id.* at 32:13-36:2, 44:9-21). This testimony is not fully trustworthy.

Belhke's testimony regarding Nicole Lee is entirely hearsay, and the testimony regarding "other sales agents" is ambiguous. Behlke never identifies when these disclosures took place or to whom Robbins disclosed. Belhke also testified that when Robbins made the disclosures, she was "directly speaking to" Managers while sales agents were present. It is unclear whether the sales agents heard Robbins as they were cycling "in and out." (*Id.* at 44:14-21). Robbins testified:

> I said we don't hire each other's people. We have that mutual understanding, and I left it at that. I don't want to wake up one morning and half his company is sitting in my hotel and these kids not understand why. We have an agreement. We don't hire these people. I don't hire -- vice versa. It's as simple as that. Leave it alone.

(Robbins Trial Test., Part III, 186:11-16). Robbins later clarified, "I didn't tell them about the agreement. I said it simple as a sentence as, I'm not hiring his people, he doesn't hire my people." (*Id.* at 192:22-24). Therefore, the only disclosure of which Behlke had first-hand knowledge was Robbins's alleged disclosure to Behlke in the summer of 2011.

Furthermore, Shoemaker testified that "the existence of [the moratorium provision" I don't think was a secret. I think that the content and the intent of it was." (Shoemaker T.T., Part I, 182:2-3).

If Behlke were a Manager, then the disclosure was permissible under the Settlement Agreement; if she were a sales agent, disclosure would be prohibited. When asked what

her status was while employed for Robbins in the summer of 2011, Behlke was not certain.

Her deposition testimony indicates she was confused. At one point in her trial deposition,

Behlke testified that she "went over under the impression [she] was a junior manager."

(Behlke Tr. Dep., at 45:4-5, 45:17-21).[13] She had been a Manager with ACI previously, as

well. (*Id.* at 57:9-58:4). When Plaintiffs' counsel asked her whether Managers usually have

sales agents underneath them, Behlke responded that at one point, she did have agents

working under her. (*Id.* at 13:14-16).

However, upon pressing from Plaintiffs' counsel over whether Robbins disclosed the

terms of the Agreement when Belke was a sales agent, Behlke stated, "I was a sales agent

for the last portion of working for her. So I don't – I'm not – yes, it would be a true

statement." (*Id.* at 15:1-7). She later said, "I mean I was a sales agent during

conversations to which she mentioned the settlement agreement." (*Id.* at 16:8-10).

Finally, Robbins testified in Court that she disclosed the terms of the Agreement to

Behlke, but Behlke was a Manager who had "[m]aybe one or two people" working under

her. (Robbins Trial Test., Part III, 195:1-6).

Because the Court did not have an opportunity to see Ms. Behlke live, has only her

confused deposition transcript to draw from, and Robbins testified that Behlke was a

Manager at the time of disclosure in July 2011, it finds that Plaintiffs have not met their

---

[13] Earlier in her deposition, Behlke stated that as of July 2011, she "was a junior manager that sold magazines," but she did not have a written contract with Robbins. (*Id.* at 10:21-11:5).

burden of proof of showing that Robbins disclosed the terms of the Agreement to Behlke in violation of the confidentiality provision of the Agreement.

### Plaintiffs' Alleged Breach

On the other hand, Defendants claim that Plaintiffs breached the Confidentiality provision by filing the present lawsuit and filing the Settlement Agreement as an exhibit to the Complaint. (See Doc. 1, Ex. A). This is the only allegation that Plaintiffs ever breached the Confidentiality provision. As a matter of law, this argument fails.

"[S]ettlement documents can become part of the public component of a trial under either of two circumstances: (1) when a settlement is filed with a district court; and (2) when the parties seek interpretative assistance from the court or otherwise move to enforce a settlement provision." LEAP Systems, Inc. v. MoneyTrax, Inc., 638 F.3d 216, 220 (3d Cir. 2011) (internal citations and quotation marks omitted). In the previous litigation between the parties which culminated in the Settlement Agreement, the parties filed a Stipulation of Dismissal which Judge Caputo signed before dismissing the case. (See 1:08-CV-2063, Docs. 66, 67). In the Stipulation, the parties agreed that this Court would "retain jurisdiction for any and all disputes, claims, or causes of action arising out of the parties' settlement agreement including, but not limited to, the settlement agreement's Moratorium against business relations with Managers of other parties to the settlement, the Agreement Not to Disparage . . . , and the Confidentiality Agreement." (Id.). This satisfies the second test set forth in LEAP Systems, wherein the Third Circuit noted that "the parties specifically

38

requested at the March 25, 2008 proceeding that the District Court retain jurisdiction to interpret and enforce the terms of the settlement agreements." 638 F.3d at 221. Therefore, the settlement agreement was a "judicial document for purposes of determining the public's right of access." *Id*. at 220.[14]

Here, once a dispute arose as to whether Defendants had breached the terms of the Settlement Agreement and Plaintiffs filed a Complaint asking this Court "to interpret and enforce the terms" of the Agreement, the document became a judicial record "subject to the common law 'right of access' doctrine." *LEAP Systems*, 638 F.3d at 221. Therefore, there was no breach of the Confidentiality agreement when Plaintiffs temporarily attached the Settlement Agreement to the Complaint.[15]

Defendants rely heavily on *Toon v. Wackenhut Corrections Corp.*, for the proposition that attaching a confidential settlement agreement as an exhibit to a court filing is a *per se* breach of confidentiality. 250 F.3d 950 (5th Cir. 2001) (affirming sanctions imposed on the plaintiffs' counsel for disclosing the terms of a settlement agreement which called for the defendant to pay $1,500,000 to the plaintiffs' counsel by a date certain for alleged sexual, physical, and mental abuse committed by the defendant's employees against the plaintiffs, who were young girls at a juvenile correctional facility). The facts of *Toon* were unique and

---

[14] Ultimately, though the settlement agreement was a judicial document, the Third Circuit upheld the district court's sealing of the agreement because the right of public access to judicial records is not absolute, and the parties "would not have entered into the settlement agreements but for the Court's assurance of confidentiality." *Id*. at 222.

[15] The Settlement Agreement was attached as Exhibit A to the Complaint and subsequently removed from the docket. Thereafter, any time either side attached the Agreement as an exhibit, it did so under seal. Furthermore, Defendants do not show how they were harmed, if at all, by Plaintiffs' "disclosure" of the Agreement to the public.

entirely different from the facts at issue here. In affirming the district court's finding of bad

faith and assessment of sanctions on the disclosing party, the Fifth Circuit noted several

facts supporting the finding of bad faith:

> Plaintiffs' counsel intentionally filed the motion to enforce unsealed, exposing
> the terms of the settlement agreement to the public. Compounding their
> disregard of the confidentiality provision in the settlement agreement, one of
> the attorneys allowed himself to be quoted in a newspaper article exposing
> the settlement agreement. . . . For example, counsel argue that they
> researched the relevant case law and determined that it was in their client's
> best interest to file the enforcement motion unsealed. . . . Also indicative of
> bad faith is the justification offered by plaintiffs' counsel to the district court
> that the public had a right to know about the conduct of [the defendant's]
> employees.

*Id.* at 953. Referring to multiple communications between counsel regarding the confidential

nature of the agreement (including a letter which reminded the plaintiffs' counsel that all

future filings with the district court stemming from the agreement would be kept confidential,

that is, filed under seal), the Fifth Circuit concluded, "confidentiality was at the heart of the

settlement agreement. The agreement encompassed very delicate claims, and maintaining

the confidentiality of the sensitive nature of the plaintiffs' allegations was a preeminent

concern for both sides of the litigation." *Id.* Rejecting the plaintiffs' counsel's proffered

reasons for failing to file the motion under seal, the Court found that "in reality, plaintiffs'

counsel simply engaged in self-help albeit under the guise of seeking judicial intervention."

*Id.* at 953-54.

Therefore, as a matter of law, Plaintiffs did not breach the Confidentiality provision when they temporarily attached the Settlement Agreement as an exhibit to their initial Complaint.

## Conclusion

In summary, the Court finds that Defendants breached the Settlement Agreement six times by accepting subscription orders from Baker, Cowart, Fallin, Nelson, Rowe, Jr., and Sheets during the Moratorium. The Court finds no other breaches of the Settlement Agreement by either side and thus awards no damages on either side's breach of Confidentiality claims or on Defendants' counterclaims for breach of the Moratorium.

Normally, in a breach of contract claim, once the Court has determined a contract existed and one party breached a duty imposed by that contract, it would determine what actual damages, if any, are appropriate. This analysis would include any mitigation of damages on the part of the prevailing party.[16] For instance, the joint statement of facts shows that Sheets and Rowe, Jr. returned to ACI after a brief stint with Midwest. (SOF ¶¶ 22, 41). Furthermore, it appears from Fallin's sales record with Blue Diamond that he never submitted a sale to Stice before moving to Midwest. (Pl. Ex. 34). These considerations surely would have factored into the Court's determination of the damages to which Plaintiffs are entitled.

---

[16] See TruServe Corp. v. Morgan's Tool & Supply Co., Inc., 39 A.3d 253, 262 (Pa. 2012).

However, because the Settlement Agreement contains a liquidated damages provision, an inquiry into the actual damages incurred is unnecessary. Accordingly, the Court awards $75,000, as agreed to by the parties, per breach for a total of $450,000 in favor of Plaintiffs. The Court notes that this award is a considerable sum which is entirely the result of the parties' previous agreement in which they were both represented by competent counsel and agreed to these liquidated damages provisions.

## Tortious Interference Claims

Here again, each side accuses the other of interfering with its Managers. At trial, Attorney Lau represented to the Court that Plaintiffs are not seeking a double recovery on both the breach of contract and tortious interference claims for Defendants' hiring of Plaintiffs' six Managers. This was an affirmation of Plaintiffs' previous position at oral argument. (Tr. of Oral Arg. at 23:4-7; "So it's our contention that [Robbins] did interfere with those contracts . . . which is an alternative remedy that we brought forth."). Because the Court has granted all six of Plaintiffs' breach of contract claims regarding the Moratorium, it will not address Plaintiffs' tortious interference claims.

Furthermore, because the Court finds that Robbins waived her rights to sue under the Settlement Agreement when she agreed to sell her contractual rights to Hayes and Smith, Shoemaker and ACI could not have tortiously interfered with her rights to Hayes and Smith. As stated above, there is also no evidence that Stice was acting on behalf of Shoemaker as Shoemaker's agent when he agreed to purchase the contractual rights of

Hayes (which also covered Smith). Therefore, Defendants have not shown how liability

would be imputed to Shoemaker for the actions of Stice. Nevertheless, the Court will

engage in an analysis of Defendants' claims.

Under Pennsylvania law, a party must show the following to establish a tortious

interference with a business relationship claim:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Steffy & Son, Inc. v. Citizens Bank of Pennsylvania*, 7 A.3d 278, 288-89 (Pa. Super. Ct.

2010). It is clear that at the time of the Stice-Robbins agreement, Hayes and Smith had

Independent Contractor agreements with Midwest and Robbins, thus satisfying the first

element of tortious interference. However, there is no evidence that either Stice or

Shoemaker took "purposeful action" to poach Hayes and Smith from Robbins.

Stice testified that it was Hayes who first approached him about hiring her. In fact, "I

was against it at first, one hundred percent. I think it was a horrible idea to bring Kiana back

after what she has done and how she acted throughout her stay." (SOF ¶ 68; Stice Tr.

Dep., 32:20-23). However, he relented because "Kiana was begging and begging and

begging for a job." (*Id.* at 33:9-10). Lacey Knight, Stice's fiancée, also testified that Hayes

"begged to come back. Well, she really had to beg Brandon because he didn't want her to

come back. I had to talk him into it." (Knight Tr. Dep., 51:18-20). Lastly, Hayes testified

that she initiated contact with Lacey Knight before returning to work for Stice. "I texted Lacey, and we just started talking again, and then I just went back over there." (SOF ¶ 67; Hayes Tr. Dep., 33:25-34:8).

Thus, Stice was initially against taking Hayes back onto his sales crew, so he did not take "purposeful action" to harm Robbins. Furthermore, as stated before, upon learning of Stice's proposed purchase of Hayes's and Smith's contracts from Robbins, Shoemaker "got into a major fight with Brandon." (SOF ¶ 74). The evidence further shows that Shoemaker instructed Stice not to go through with it, and if he did, to ensure that any transaction was consummated in writing. (SOF ¶ 72). This is assuredly not the type of "purposeful action" intended to harm Robbins that is necessary to establish a tortious interference claim. Therefore, the Court will not award Defendants any damages for their counterclaim for tortious interference.

## Conclusion

In conclusion, the Court finds that Defendant breached the Settlement Agreement's Moratorium provision six times by accepting subscription orders from Baker, Cowart, Nelson, Sheets, Fallin, and Rowe, Jr. Therefore, the Court awards Plaintiffs $450,000 as agreed to by the parties in the Settlement Agreement - $75,000 for each breach. In turn, the Court awards nothing to Defendants because Plaintiffs did not breach when Stice agreed to purchase the contractual rights to Hayes and Smith from Robbins.

44

In addition, the Court finds that neither side proved a breach of the Confidentiality provision of the Settlement Agreement and, therefore, awards no damages to either side.

Finally, the Court awards no damages to either side on its tortious interference claims. Plaintiffs receive no damages because they have already succeeded on their breach of Moratorium claims, and awarding damages for tortious interference would be a double recovery. Defendants receive no damages because the evidence shows that Hayes initiated contact with Stice to inquire about joining his crew, Robbins waived her contractual rights to Hayes and Smith by entering an agreement to sell her rights to Stice, Shoemaker is not liable to Robbins for Stice's non-payment under the agreement because Stice was not acting as Shoemaker's agent during the transaction, and there is no evidence that Stice took purposeful action to harm Robbins.

Robert D. Mariani
United States District Judge